## CENTRAL TRANSFER RAILWAY & STORAGE CO. et al. v. LOUISVILLE & N. R. CO.

Court of Appeals of Kentucky.

Jan. 30, 1951.

Rehearing Denied May 25, 1951.

———◆———

Bradley & Bradley, Georgetown, Louis Seelbach, Louisville, S. G. Boxley, Washington, D. C., for appellants.

Will H. Fulton, E. D. Mohr, C. T. Coomes, J. H. McChord, Louisville, for appellee.

CLAY, Commissioner.

Appellants, Central Transfer Railway and Storage Company and Southern Railway Company (hereinafter referred to as "Central" and "Southern" respectively) brought this action for a declaration of rights and an accounting against appellee, Louisville and Nashville Railroad Company (hereinafter referred to as "L. & N."). The suit is based on a written contract executed in 1899.

Central and Southern assert that under the terms of this contract as construed by the parties, L. & N. has, over a long period of years, collected and retained certain freight charges for which it should account, and has failed to collect other charges which should have accrued to Central. The total amount claimed is something over $372,000. The Chancellor found for L. & N., and dismissed the petition of Central and Southern.

The controversy arises over the use of what is known as the "Hub Track," a railway three-quarters of a mile in length which connects the lines of the Illinois Central Railroad Company (hereinafter referred to as "I. C.") with those of L. & N. in Louisville. This track extends from the I. C. yard at 14th and Dumesnil Streets to the L. & N. yard at 9th and Oak.

Central was incorporated in 1884, and the value of its property has at no time exceeded $40,000. In 1899 all of the capital stock of this company was owned in equal shares by Southern and L. & N. In that year they entered into the contract which lies at the heart of this lawsuit. Central was not a party thereto.

The agreement recites the intention of Southern and L. & N. "to use jointly" the tracks of Central. Section 1 relates to the directorship of the corporation. Section 2 provides for the maintenance and operation of Central's tracks by Southern and L. & N. alternately from year to year, but either could continue in control of the property unless the other party exercised its right to do so. As a matter of fact, L. &.N. has maintained and operated the Hub Track since 1919.

Section 3 provides that each company is to render to the other a monthly statement showing "the number of loaded cars that have been passed over any portion of the track * * * for its account."

Section 4 of the contract provides: "4. The taxes, cost of maintenance and operation, interest upon twenty-thousand dollars ($20,000.00) of bonds, and a four per cent. dividend upon the capital stock are to be raised by *revenue received by the Storage Company,* and an apportionment monthly of *the balance needed* between the parties to the agreement in the proportion that the number of *loaded cars of each company passing over the tracks* or any part of the tracks of the Central Transfer Railway & Storage Company bears to the total number of loaded cars passing over the tracks or any part thereof." (Our italics.)

Section 5 provides in part: "It is contemplated that each company shall with its *own engines* move its *own trains* with its *own crews* over the said tracks, * * *." (Our italics.)

Southern's and Central's claim arises from a change, effected in 1924, in the method of operation over the Hub Track between L. & N. and I. C. Prior to that time. L. & N.'s *engines and crews* handled the interchange of freight cars between the I. C. yard and the L. & N. yard. The interchange was actually made at the west end of the Hub track at 14th and Dumesnil, where the I. C. yard is located. L. &.N. accounted for these "loaded cars" interchanged over this track, in accordance with the terms of Section 4 above quoted, and it

paid its proper share of Central's annual expenses on the basis thereof.

After 1924, instead of L. & N. engines effecting the interchange of cars at the I. C. yard, *I. C.'s engines and crews* began moving these cars over the Hub Track and made the physical transfers at the L. & N. yard. Several reasons were suggested for this change in method of operation, but they appear immaterial.

The contention of Central and Southern is that whenever *engines and crews of other companies* handled freight cars over the Hub Track, it was the duty of L. & N. to collect charges for such *use of the track* and to account for those charges as "revenue received by the Storage Company" under Section 4 of the contract. It is shown that L. & N.: (1) actually collected and accounted to Central for certain charges assessed, on a particular class of traffic, against other railroads using the Hub Track; (2) actually collected from I. C. certain charges, apparently for the use of the Hub Track, for which it did not account; and (3) after 1934 did not collect any charges from I. C. for the use of the track in interchange operations. Central and Southern not only ask an accounting for the charges actually collected and not accounted for, which amount to something over $17,000, but also for all reasonable charges that should have been made. They contend these obligations were created by the contract as practically construed by the parties over a long period of years.

■ L. & N. devotes a substantial portion of its argument to the proposition that the 1899 contract is free from ambiguity, and for that reason a vast amount of evidence introduced in the case is incompetent and inadmissible. If this contention be sound, we are at a loss to understand why L. & N. found it necessary to devote 250 pages of printed brief to an explanation of the meaning of the contract and an analysis of the evidence. With respect to the question involved, the contract is by no means clear, and does not cover the situation which developed with any degree of certainty. The history of this litigation itself shows that from time to time both parties were confused concerning the proper interpretation of the contract, and for many years were in disagreement. Under such circumstances, evidence was competent to show the acts and admissions of the parties in construing its true meaning. We will briefly discuss that which appears most significant.

In 1903 a question arose concerning charges made for the use of the Hub Track by other railroad companies delivering cars to the sidings of industries located along the line. In an interchange of letters, L. & N. admitted that on business handled by lines other than L. & N. and Southern "to and from industries on the Hub Track," a "trackage charge" should be made and should be credited to Central.

In 1911 there was some dispute concerning the interchange of cars between the L. & N., and the L.H. & St.L. Railroad Company. Southern took the position that the track was being used by the latter company, and therefore charges which would accrue to Central should be collected by L. & N. As a matter of fact, these particular cars were being handled by L. & N. engines. A representative of L. & N., after pointing this out in a letter, stated in substance that Central was to be credited with "trackage charge" revenue only on business handled by lines other than L. & N. and Southern; and in this letter the statement is made that the situation would be different if the L.H. & St.L. had handled this business "with their own power."

It appears that until 1924 the business was conducted in accordance with the above understanding, and where other lines carried out the switching or interchange operations, a charge was collected by both L. & N. and Southern, and accounted for to Central. These cars were *not* listed by either party as "loaded cars" of either L. & N. or Southern for the purpose of determining the proportionate share of the expenses to be borne by each party under Section 4 of the contract.

In 1941 the parties corresponded with respect to the controversy which is the basis of the present suit. A representative of Southern wrote to the L. & N. advising with

respect to its interpretation of the 1899 agreement. Mr. Jouett, General Counsel for L. & N., replied to this letter. He stated: "* * * I am willing to agree that if this company has exacted from the Illinois Central a charge for moving cars over the Hub Track with its engines and crews, and those cars were cars of the Illinois Central, and not cars of this company, then there should be an accounting with the Storage Company."

He then went on to say, however, that the "interchange point" between L. & N. and I. C. was at the west end of the Hub Track, i. e., the I. C. yard at 14th and Dumesnil, and that the freight cars became those of L. & N. at that point regardless of whose engines or crews moved them over the Hub Track. He stated that "constructively" the I. C. engines and crews had become the engines and crews of L. & N.

The evidence shows that from time to time L. & N.'s tariffs included a special charge ostensibly for the use of Central's property. Thus from 1908 to 1934, L. & N. published a tariff rate of $1.35 per car "for the use of the Hub Track" on business originating at, or destined to, industries on the L. & N. line "interchanged with the I. C. at 14th and Ormsby" (one block south of 14th and Dumesnil, the location of the I. C. yard). After 1934, L. & N. published a "Hub Track charge" of $1.35, but in the tariff noted that it would "absorb" this charge on north bound "competitive" business.

On another class of business (traffic moving from I. C. industries to L. & N. road haul, and from I. C. industries to L. & N. industries), L. & N. neither published nor collected a charge for the use of the Hub Track. Central and Southern contend that L. & N. must account for the charges it undertook to "absorb," but actually waived; and for the other charges it failed to publish or collect; the principal ground being that L. & N. profited from a competitive standpoint as a result of I. C.'s free use of the track.

■ At this point it is appropriate to dispose of L. & N.'s contention that it had no duty to account to Central for any charges collected for use of the Hub Track by railroads other than L. & N. and Southern. Without analyzing the many points raised with respect to the parties' obligations, the evidence above discussed shows clearly L. & N. has recognized a duty to account to Central for certain charges collected for use of the Hub Track. Whether we consider Central as the owner of the track, or Southern and L. & N. the joint owners, L. & N. could not properly earn for itself *a special profit from the use of property* owned by another (Central) or in which another (Southern) has a joint interest. Since L. & N. has acknowledged some duty to account under the contract, it simply cannot deny the existence of that responsibility. Of course the extent of its obligation and the particular items for which it must account raise additional questions.

■ We may also here dispose of other L. & N. defenses which do not involve a construction of the contract itself. It is argued that due to the lapse of time since L. & N. changed its method of operation with I. C. in 1924, this suit should be barred by laches. It is said that Southern's supervisory employees must have known that I. C. engines had been using the Hub Track for interchange with L. & N. since 1924, and this suit was not filed until twenty years later in 1944. However, the higher officials of Southern did not have this knowledge until 1930. It is also significant that between 1924 and 1930 L. & N. reported to Southern monthly the number of cars handled by it, and these reports recited that those cars were handled "by L. & N. engines." Under such circumstances, we do not think that prior to 1930 Southern had full knowledge of the facts which would constitute the basis of the charge of laches. Soon after 1930 Southern asserted its claim, and the subsequent circumstances would not justify a finding that the mere lapse of time before filing suit prejudiced L. & N., or would make it inequitable for Southern and Central to recover that to which they were rightfully entitled.

■ L. & N. also insists that Southern acquiesced in its practice; that it waived.

its right to object; and that it is estopped to recover in this action. It appears, however, that after 1930 the parties engaged in extensive correspondence and conferences with respect to the present controversy. From that date on L. & N. was aware Southern was insisting on the claims presented in this suit. L. & N. is not in a position to maintain it was misled or prejudiced because the suit was not actually filed until 1944. It simply continued a practice which it knew had been brought in question, and could not thereby create equities in its favor.

We return again to the contract and the interchange operations between L. & N. and I. C. after 1924. For practical purposes under the contract, it is apparent that no material change was made with respect to *the movement of loaded cars over the Hub Track* in which L. & N. had an interest. It is true that prior to 1924 L. & N. engines handled those cars, and after that date, I. C. engines did so. However, it is significant that *the point of interchange* under the applicable tariffs continued to be the same, i. e., at the I. C. yards at 14th and Dumesnil (or at 14th and Oak under some tariffs, which is substantially the same). We must bear in mind that the number of cars passing over the track for each party's account was important only in determining the proportionate expenses to be shared, and the parties did not originally anticipate that the use of the track would create substantial earnings.

It is necessary to re-examine the meaning of Section 5 of the contract which provided in part that it was contemplated each company would move its own trains with its own engines and crews. The whole paragraph of Section 5 relating to this matter reads as follows: "It is contemplated that each company shall with its own engines move its own trains with its own crews over the said tracks, and the words 'operation' or 'operating' as used in this contract shall be construed only as referring to the power and duty of the company operating and maintaining the track to prescribe and enforce rules for the movement of engines and cars so as to se-cure the orderly use of the tracks in an equitable and just way as between the parties."

It appears the reference to engines and crews was by way of explaining the words "operation" and "operating," and indicates the party in control of the Hub Track, for any given period, would not be required to furnish its own engines or crews to move traffic for the other party thereto, or other railroad companies. The negotiations leading up to this provision in the contract show clearly that the "own engine and crew" provision did not have a broader significance.

The fact is, however, that both Southern and L. & N. practically construed that portion of the contract as having some relationship to the use of the Hub Track by other railroads. As we have already pointed out, both parties have recognized that in certain instances, where other lines were using the track for their own purposes, a trackage charge should be collected and accounted for.

One of the vital questions in the case is whether or not this interpretation can be extended to include a type of operation where, even though the engines and crews of a railroad other than L. & N. or Southern pass over the Hub Track in making an interchange, the loaded cars are actually moved for the "account" of one of the principal parties.

The Jouett letter of 1941, upon which Southern and Central so strongly rely, made that very point. It did not admit that simply because I. C. engines and crews moved a train on the Hub Track a special trackage charge should be made therefor. There was the qualification that "those cars were the cars of the Illinois Central, and not cars of this company * * *." While ordinarily the freight cars of a train are identified with the engine and crew, it is entirely reasonable that some other arrangement could be made and that the cars moved by I. C. were actually those of L. & N. Section 3 of the contract refers to "loaded cars" passed over the Hub Track "for its account," not "loaded cars hauled

by engines and crews of L. & N." "For account of" means on behalf of, or chargeable to.

It is shown that since 1916 Southern has rented engines from the K. & I. Railroad, and has used them in switching operations on the Hub Track. Not only have these K. & I. engines moved the cars of Southern, but have also moved cars brought into Louisville by other railroad companies. However, since Southern had an interest in these cars, even though moved by K. & I. engines, it has reported them as "loaded cars of Southern." While the arrangements between Southern and K. & I. and L. & N. and I. C., are dissimilar in many respects, it is evident that Southern itself has not considered ownership of the engine as conclusively identifying the freight cars moved on the Hub Track.

It is unfortunate that there is little evidence of the precise agreement entered into between L. & N. and I. C. in 1924, when the method of interchange between the two was changed. Southern and Central complain bitterly because the Chancellor made mention of this agreement in his opinion, they taking the view that his decision was based almost entirely upon something that did not exist. We do not so read the opinion. It simply says that I. C. and L. & N. agreed to make physical deliveries of cars at "extended" points, and if the agreement had not been entered into, L. & N.'s loaded car count would have been the same. This is no more than a finding that the change in method of operation did not change *the classification of the cars* as being moved for the account of L. & N.

We are faced with this situation: there must have been some agreement between L. & N. concerning the interchange operation begun in 1924. True, as Central and Southern argue, it could not relieve L. & N. of any of its obligations under its contract with Southern. If, however, it did not change the classification of the loaded cars from what they had been before 1924, it did not create new duties under the contract.

The following evidence is significant. In 1939 an I. C. engine hauling interchange to

L. & N. was derailed on the Hub Track. The parties engaged in correspondence as to whether or not the damage costs should be charged to Hub Track expense or should be paid by L. & N. After Southern paid its proportionate part as a Hub Track expense, its money was refunded by L. & N. for the reason that the movement was being made for its account. This was a very small item, but indicates the parties treated the operation as if it was being carried out by L. & N.'s own engine and crew.

We next come to the so-called "Brooks' letter" of 1927. Central and Southern lay great stress on this letter as giving I. C. the right to operate over the Hub Track for its own account. In 1926 the Vice-President of L. & N. wrote to Mr. Longstreet of I. C. He requested I. C. to pay 31¢ per car for all loads delivered by I. C. to L. & N., this figure being the proportionate amount L. & N. had contributed to the expense of operating the Hub Track for the preceding year. I. C.'s General Manager replied by writing to Mr. Brooks, General Manager of L. & N. He stated that I. C. was then paying L. & N. $1.35 per car on the basis of a published tariff. (This was the same charge that had been paid prior to 1924 when L. & N. engines were transporting the cars.) He stated I. C. would accept the charge of 31¢ per loaded car, but would be glad to have a refund of the difference between that and $1.35 already paid.

Mr. Brooks retreated from the original position taken by letter of January 5, 1927. He stated in substance that there seemed to be a misunderstanding about the $1.35 charge; that this charge was the same one which had been made prior to 1924; and that I. C. would have to pay it for the use of the Hub Track according to the published tariffs. We cannot see wherein this exchange of correspondence granted I. C. any special rights. As we view this letter, and those preceding it, the indication is that no change had taken place in the classification of freight cars moved in I. C.— L. & N. interchange after 1924.

This brings us to the question of whether or not L. & N. did collect, or should have collected, a *special charge for the use of the Hub Track by I. C. engines and crews,*

for which it should account to Central. L. & N. maintains the charges published in its tariffs relating to interchange traffic were actually *switching* charges to which it was rightfully entitled because of its service performed in the movement of the trains. On the other hand, Southern and Central insist that the published charges were not switching charges, but were in effect *tolls* levied for the use of the Hub Track by I. C.

The subject of the "Brooks' letter," just discussed, lends some support to Central's and Southern's position. It appears that on business originating at, or destined to, industries on the L. & N. line, L. & N. had published in its tariffs a charge of $1.35 per car, "made account of use of the Hub Track." Such charge was *included* in the regular rate for handling this type of business, and had been in effect since 1908. Until 1924 L. & N. collected the charge from the shipper, or consignee, for its *transportation service* rendered over that track. It is not contended that prior to 1924 L. & N. should have accounted to Central for this item. The fact is, it was originally a part of L. & N.'s switching rate, which simply hung over after 1924.

■ After 1924, when I. C. began furnishing the transportation service over the track, and until 1934, the charge for this class of traffic was still published and was collected by L. & N. When the question arose between I. C. and L. & N. concerning it, the correspondence culminated in the "Brooks' letter"; and L. & N. attempted to justify the continued collection of $1.35 per loaded car as constituting a charge for the use of the Hub Track by I. C. We are somewhat in doubt as to whether or not after 1924 this was a proper charge for L. & N. to have made, since it no longer furnished the transportation service over the Hub Track (except for returning empty cars). We strongly suspect, though it is not admitted (and neither party will admit anything in this law suit), that L. & N. cancelled the charge in 1934 because it was not a proper one. The fact remains, however, that on this item, between April 1, 1929 and February 21, 1934, L. & N. actually collected from I. C. a net amount of $17,764.68. Since L. & N. justified the charge as being for the use of the Hub Track, and since it could not properly make a special profit out of Central's property, we are of the opinion that L. & N. must account for the amount so collected.

It seems clear to us, however, that this particular item cannot support Central's and Southern's claim that L. & N. was obliged to continue publishing or collecting such a charge after 1934; or had the duty under the contract of collecting a similar charge for the benefit of Central and Southern on other classes of traffic interchanged with I. C.

We again point out that the *physical use of the track* as between L. & N. and I. C. was not changed or increased after 1924, nor was there at any time an *additional* charge made because I. C. engines performed the interchange service. Since the interchange point was at all times the I. C. yard at 14th and Dumesnil, the cars transported over the Hub Track were properly identified as loaded cars for L. & N.'s account. This being the case, L. & N. had no duty to collect any charges therefor, or to render any accounting to Central or Southern in connection therewith.

■ From what has been heretofore said, we have reached the following conclusions: (1) when L. & N. and Southern entered into the 1899 agreement, it was not contemplated that Central would be either an operating or an earning company; (2) the parties intended to, and have substantially used the Hub Track as an extension of their own lines; (3) the "engines and crews" referred to in the contract did not conclusively identify the freight cars passing over the track; and (4) the loaded cars transported in interchange by I. C. engines after 1924 were for the account of L. & N. excepting those upon which L. & N. collected the $1.35 charge for the use of the Hub Track.

It follows, therefore, that the Chancellor erred in not requiring L. & N. to account to Central and Southern for the item of $17,

764.68; but properly dismissed Central's and Southern's petition insofar as other relief was asked.

The judgment is affirmed in part and reversed in part, with directions to enter a judgment in conformity with this opinion.

CAMMACK, C. J., dissents on the ground that the arrangement between L. & N. and I. C. after 1924 resulted in a substantial benefit to L. & N., attributable to the use of Central's property by I. C.'s engines and crews; and that Central and Southern have a just and equitable claim to a share in the reasonable value of those benefits received.